**In re SALT CREEK FREIGHTWAYS, a Wyoming corporation, Debtor.**

**Bankruptcy No. 85–00065–B.**

United States Bankruptcy Court, D. Wyoming.

March 28, 1985.

836

Georg Jensen, Cheyenne, Wyo., Doris M. Poppler, Billings, Mont., for debtor/petitioner.

Benjamin W. Hilley, Great Falls, Mont., for respondent.

## CORRECTED MEMORANDUM AND ORDER

HAROLD L. MAI, Bankruptcy Judge.

THIS MATTER came before the court on March 18, 1985 on the debtor's motion for an order authorizing rejection of its collective bargaining agreements with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, and Local Affiliates thereof, pursuant to § 1113 of the Bankruptcy Code; Georg Jensen, Cheyenne, Wyoming, and Doris M. Poppler, of Davidson, Poppler and Vannoy, Billings, Montana, for the debtor; and Patrick E. Hacker, Cheyenne, Wyoming, and Benjamin W. Hilley, Billings, Montana, for local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

## CASE SUMMARY

In this case, the court is called upon to decide whether to approve the debtor's rejection of its collective bargaining agreements pursuant to 11 U.S.C. § 1113. For the reasons hereinafter set forth, the court will approve the debtor's rejection of its collective bargaining agreements and enter an appropriate order.

## JURISDICTION

The court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334, and the General Order of Reference entered by the District Court for the District of Wyoming, dated July 19, 1984, entered pursuant to 28 U.S.C. § 157. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

## BACKGROUND

Salt Creek Freightways, the debtor and debtor-in-possession herein, filed a petition for voluntary relief under the provisions of Chapter 11 of the Bankruptcy Code on January 23, 1985. On February 11, 1985, after proper notice and hearing, this court granted the debtor's motion to implement interim changes in the terms of its collective bargaining agreements, 46 B.R. 347; said order to continue in effect until March 31, 1985. On March 1, 1985, the debtor filed a motion to reject the collective bargaining agreements pursuant to 11 U.S.C. § 1113. On March 11, 1985, the Union employees of the debtor went on strike and they continued to be on strike at the time of the hearing on this matter. The motion to reject the collective bargaining agreement was heard on March 18, 1985. At the hearing, the court heard testimony from James Roberts, executive officer of Local 2 and chairman of the Union Negotiating Committee; from Albert Heslin, the personnel manager of the debtor, who represented the debtor at the negotiations with the Union; and from J. Francis Trimmer, president and chief executive officer of the debtor. At the conclusion of the hearing, the matter was taken under advisement. The court having considered the testimony and evidence introduced at the hearing, the memoranda of the parties, the statements and arguments of counsel, and the record in this case, renders its decision as follows: [1]

## DISCUSSION

The debtor's motion to reject its collective bargaining agreement is governed by new Section 1113 which was added to title 11 by the Bankruptcy Amendments and Federal Judgeship Act of 1984. The only reported decision construing § 1113 since enactment of the 1984 Amendments is *In re American Provision Co.,* 12 B.C.D. 558, 44 B.R. 907 (Bkrtcy.D.Minn.1984). In that case Judge Kressel identified and applied the nine (9) statutory requirements contained in Section 1113, as follows:

---

1. This memorandum constitutes this court's findings of fact and conclusions of law as required by Bankruptcy Rule 7052 as made applicable to this contested matter by Bankruptcy Rule 9014.

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*Id.* at 559, 44 B.R. 907.

■ The debtor, as movant, bears the burden of persuasion by a preponderance of the evidence for each of the nine elements. However, once the debtor has established prima facie compliance, the burden will shift to the Union to produce evidence contradicting one or more of the nine (9) elements. *Id.* at 660, 44 B.R. 907. While the burden of going forward may shift to the Union once the debtor has made out a prima facie case on these elements, the ultimate burden of persuasion on these and the other elements always remains with the debtor. *Id.*

Turning to the facts of this case, on July 31, 1985, the debtor met the first requirement by submitting to the Union its proposal for modification of the existing collective bargaining agreement. It is uncontroverted that the proposal was based on the most complete and reliable information available at the time of such proposal.

■ Regarding the third requirement, it should be noted that only the modifications which are necessary to a successful reorganization may be proposed by the debtor. 130 Cong.Rec. S8898 (daily ed. June 29, 1984) (remarks of Senator Packwood). The testimony of Mr. Trimmer, president and chief executive officer of the debtor, is that the modifications contained in the proposal are necessary for a successful reorganization of the debtor. Similarly, the testimony of Mr. Heslin, who helped draft the proposal, established that each of the proposed modifications impacted upon the debtor's operations and was therefore necessary to enable the debtor to remain in business. Mr. Roberts, the Union's representative in the negotiations, testified that several of the proposed modifications, such as the modification of the grievance procedure, were objected to by the Union during the parties negotiations. However, the Union has not invited the court's attention to any of the specific modifications contained in the proposal to allege in what manner, if any, they may be considered unnecessary to the planned reorganization. In sum, there is no evidence before the court that any of the modifications contained in the proposal are not necessary to permit the reorganization of the debtor.

The fourth requirement is that the proposed modifications must assure that all creditors, the debtor and "all of the affected parties" are treated fairly and equitably. The inclusion of this requirement for fair and equitable treatment of all affected parties is intended to ensure that "where the trustee seeks to repudiate a collective bargaining agreement, the covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden, but only their fair and equitable share of the necessary sacrifices." 130 Cong.Rec. H7496 (daily ed. June 29, 1984) (remarks of Rep. Morrison). In the present case, the

evidence established that the company substantially reduced wages and benefits for all non-union employees, including top management. There is no evidence in the record to indicate that the debtor's proposed modifications would result in any of the "affected parties" shouldering a disproportionate burden of the debtor's cost-cutting efforts.

■ The uncontroverted testimony in this case established that the debtor provided to the Union all of the material used to prepare the debtor's proposal. The Union concedes that the debtor initially provided relevant information necessary to evaluate the proposal and that it has not requested any additional materials or information from the debtor subsequent to receiving that proposal. Nevertheless, it is the Union's position that, during the course of the subsequent negotiations between the parties, several materials were prepared by the debtor which it was under an affirmative obligation to attach to the application to reject the collective bargaining agreement. This court agrees that the debtor has an affirmative duty to provide to the Union all of the relevant financial information necessary to adequately evaluate the debtor's proposal. 130 Cong.Rec. H7496 (daily ed. June 29, 1984) (remarks of Rep. Morrison). However, after careful review of the materials in question as well as the testimony concerning them, this court concludes that the debtor provided all such relevant information to the Union. Most of the material in question, including the debtor's estimates of the cost of the various Union counter-proposals, was conveyed orally to the Union during the negotiating sessions. The requirement of § 1113(b)(1)(B) is that the debtor provide such relevant information to the Union as is necessary for the Union to evaluate the debtor's proposal. It does not require, as the Union contends here, that the debtor also provide the Union, as part of its application to reject, with the written estimates necessary to evaluate the costs of the Union's own counter-proposals.

■ The Union concedes that between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor did meet at reasonable times with the Union. It does contest, however, that the debtor met and conferred in "good faith" as required by Section 1113(b)(2). In this court's view, however, the following facts, together with those previously discussed, establish a prima facie case that the debtor has bargained in "good faith": (1) The debtor met four times with the Union between February 1, 1985 and March 15, 1985, each time at the request of the debtor; (2) The debtor considered and analyzed each of the Union's counter-proposals and orally conveyed to the Union the figures supporting its contention that the Union's proposed reductions were insufficient to allow it to remain in business; (3) The debtor proposed an alternative insurance plan for the Union employees and offered to join the Union's proposed insurance plan if it could acquire the benefits for the same price; (4) At the debtor's request, a federal mediator was asked to mediate towards settlement at the last negotiating session; and (5) The debtor has placed its "Last Best Offer" before the Union. On the other hand, the Union argues that the debtor has maintained a "hard and fast" stand in negotiations. The Union asserts its continued willingness to negotiate further until a settlement can be reached.

The stumbling block to reaching an agreement between the parties appears to be in two principal areas. First, the debtor will only agree to negotiate using the National Master Freight Agreement "format," while the Union insists that an agreement be reached only "within the confines" of the National Master Freight Agreement. Second, the company will not agree to either a pay-back of its delinquent pension trust obligation or a continuation of those obligations, while the Union will not agree to a contract that does not satisfy these same obligations. The Union argues that the debtor's failure to reach agreement with it on these issues is the result of "bad

faith." The court does not agree. In the court's view, the first area of disagreement seems more rhetorical than real. With regard to the second area of disagreement, the concerns and interests of the parties are great. Resolution of this issue will require a major realignment of the competing interests, and the failure to reach agreement appears to be the result of the difficultness of the task, rather than the lack of "good faith" of either party. Based upon the evidence in this case, the court concludes that the debtor has established by a preponderance of the evidence that it met and bargained in "good faith" with the Union.

The eighth requirement, that a court may only approve rejection if the Union has refused to accept the debtor's proposal "without good reason," has not yet been construed in any reported decision. Turning to the legislative history, the court finds guidance interpreting § 1113(c)(2) from the following explanatory statements:

The phrase "good cause" is undefined, but the conferees clearly believed that it should be interpreted narrowly by a reviewing court; it certainly was not intended to permit virtually any refusal on the part of the labor representative. It should be on the basis of facts directly resulting from the contract between the debtor and his employees, contract immediately before the bankruptcy judge in the chapter 11 proceeding. It should not involve contracts with unions other than those immediately before the court.

130 Cong.Rec. H7495 (daily ed. June 29, 1984) (remarks of Rep. Lungren).

The phrase "without good cause" in subsection (c)(2) of the new section 1113 ... is intended to ensure that a continuing process of good faith negotiation will take place before the court involvement.

130 Cong.Rec. H7496 (daily ed. June 29, 1984) (remarks of Rep. Morrison).

The requirement that the union refusal to accept the proposal be "without good cause" is obviously not intended to import traditional labor law concepts into a bankruptcy forum or turn the bankrupt-cy court into a version of the National Labor Relations Board. Again, the intent is for these provisions to be interpreted in a workable manner ..."

130 Cong.Rec. S8888 (daily ed. June 29, 1984) (remarks of Sen. Thurmond).

In the spirit of good faith that should permeate these negotiations, however, the unions must not reject the business offer without good cause. This opportunity to accept or reject the proposal should be assessed in light of the essentiality of swift and fair resolution of the initial phases of the reorganization. Accordingly, rejection of a proposal should only happen if the cause for rejection is good enough to risk the damage to the business as well as its creditors and employees that delay or protracted negotiations could produce.

130 Cong.Rec. S8892 (daily ed. June 29, 1984) (remarks of Sen. Hatch).

In practical terms, this language imposes no barrier to rejection if the debtor's proposal has contained only the specified "necessary" modifications.

130 Cong.Rec. S8898 (daily ed. June 29, 1984) (remarks of Sen. Packwood).

 In view of the foregoing, it is the opinion of this court that, in order to approve an application for rejection, it is not necessary to find that a Union has rejected the debtor's proposal in "bad faith" or for some contrary motive. In fact, the Union may often have a principled reason for deciding to reject the debtor's proposal and which may, when viewed subjectively and from the standpoint of its self-interest, be a perfectly good reason. However, the court must review the Union's rejection utilizing an objective standard which narrowly construes the phrase "without good cause" in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses. In the present case, the court does not have any direct testimony on the express reasons for the Union's rejection, although several may be inferred from the general testimony regarding the progress of the negotiations. Apparently the Union rejected the debtor's proposal in

its entirety due to a policy determination that the Union could not negotiate away the pension benefits or its affiliation with the National Master Freight Agreement. Although this is certainly not an unreasoned basis for rejection of the debtor's proposal, it does not constitute "good cause" within the meaning of § 1113(c)(2). In determining whether the Union has refused the debtor's proposal "without good cause" the court will not consider any other union contract, such as the National Master Freight Agreement, which is not directly before the court. *See* 130 Cong.Rec., *supra*, at H7495. Further, in view of the fact that the company has negotiated in good faith and the debtor's proposal contains only the specified "necessary" modifications, the court concludes that the Union's refusal to accept the debtor's proposal in this case was "without good cause" within the meaning of § 1113(c)(2). *See* 130 Cong.Rec., *supra*, at S8898.

The last requirement, that the "balance of the equities must clearly favor rejection," essentially embodies the standard for the rejection of collective bargaining agreements adopted by the United States Supreme Court in *N.L.R.B. v. Bildisco and Bildisco,* —— U.S. ——, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). 130 Cong.Rec., *supra*, at S8892, H7499, and S8890. By the inclusion of the word "clearly" in § 1113(c)(3), Congress intended to clarify that rejection was only appropriate where the equities balance decidedly in favor of rejection. 130 Cong.Rec., *supra*, at S8890.

In *Bildisco,* the Supreme Court described the "balance of the equities" test as "higher than that of the 'business judgment' rule, but a lesser one than that embodied in the *REA Express*" case. 104 S.Ct. at 1196. In striking the balance in this test, the Supreme Court stated that a Bankruptcy Court must focus on the goal of Chapter 11 when considering those equities, and must consider only how the equities relate to the success of the reorganization. *Id.* at 1197. The Supreme Court further stated,

Determining what could constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative difference between the types of hardship each may face.

*Id.* at 1197.

Balancing the equities in this case requires consideration of a multiplicity of factors. Several, although not by themselves dispositive, should be noted. First, there has been no allegation by the Union that the debtor has filed this bankruptcy solely for the purpose of ridding itself of its collective bargaining agreement. Second, the policy of reorganization, will be furthered by the rejection of the collective bargaining agreement in this case. It is clear from the evidence that the debtor will be forced into liquidation if it is not allowed to implement all of its cost-cutting plans, including the reduction of wages and benefits for its union personnel. Third, under Section 502(c), losses occasioned by even a court-approved rejection of a collective bargaining agreement must be estimated, including unliquidated losses attributable to fringe benefits or security provisions like seniority rights. *Bildisco, supra,* 104 S.Ct. at 1199 n. 12. Thus, it appears that, if the contract is rejected, the union employees will be in a better position than the other non-contractual employees of the debtor because they may receive dividends based on unsecured claims for the damages resulting from the court-approved rejection of the collective bargaining agreement. Because the non-union employees of the debtor are not working under a contract, they would have no similar unsecured claims based upon the debtor's unilateral reduc-

tions of their wages and benefits.[2] Additionally, under § 507(a)(3) and (4), unsecured claims made by workers to cover benefits such as pension plan obligations are granted a certain priority over the claims of other unsecured creditors. Accordingly, from an equitable standpoint, it appears that the union employees are not being made to bear a disproportionate share in the debtor's reorganization efforts.

 Fourth, following the formal approval by the bankruptcy court of the rejection of the collective bargaining agreement, the status of the Union as the exclusive bargaining representative will remain unchanged. Thus, the debtor will continue to have a duty to bargain in good faith towards achieving a new contract with the Union. *Bildisco, supra,* 104 S.Ct. at 1201; *In re American Provision Co., supra,* 12 B.C.D. at 560 n. 8, 44 B.R. 907.

Lastly, even though the agreement in question arguably expires March 31, 1985, it is not clear, absent rejection, whether, under the National Labor Relations Act, the debtor may make unilateral changes in a collective bargaining agreement, after the apparent expiration of the contract.

In balancing the equities of this case, having considered all of the factors set forth in the *Bildisco* analysis, including the potential hardship faced by each of the affected parties, and the consequences of liquidation for the debtor, the creditors, and both the Union and non-union employees, this court concludes that the balance of the equities clearly favor rejection of the collective bargaining agreement.

## CONCLUSION

The debtor has established by a preponderance of the evidence that it has met each of the requirements pursuant to Section 1113 for court approval of the application to reject the collective bargaining

agreement. Therefore, after careful consideration, the court concludes that the balance of the equities in this case clearly favors rejection of the collective bargaining agreement.

The court will enter an appropriate order.

---

**2.** This advantage over the non-union employees would be even greater if the collective bargaining agreement were not rejected, because then the expenses and liabilities incurred under the collective bargaining agreement "may be treated as administrative expenses, which are afforded the highest priority" for payment out of the debtor's estate. *Bildisco, supra,* at 1199, citing 11 U.S.C. § 503(b)(1)(A).