## In re CAREY TRANSPORTATION, INC., Debtor.

### Bankruptcy No. 85 B 10460.

United States Bankruptcy Court, S.D. New York.

June 14, 1985.

Shea & Gould, New York City, for debtor; Stuart Hirshfield, Richard Czaja, New York City, of counsel.

O'Connor & Mangan, Long Island City, N.Y., for Local Union 807; J. Warren Mangan, Long Island City, N.Y., of counsel.

## DECISION AND ORDER ON APPLICATION TO REJECT COLLECTIVE BARGAINING AGREEMENTS

BURTON R. LIFLAND, Bankruptcy Judge.

This contested matter was brought on by the Application of Carey Transportation, Inc., the debtor in possession ("Carey" or "the Debtor"), to reject two collective bargaining agreements with Bus Drivers and Truck Drivers Local Union No. 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 807" or "the Union"). One of the agreements covers about one hundred and five drivers; the other covers 10 station personnel. Based on the following Decision and Order, Carey's Application is granted.[1]

*Factual Background*

Carey filed a voluntary petition for reorganization under § 301 of the Bankruptcy Reform Act of 1978 ("the Code"), as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA").

Carey is a privately held company whose primary business operations are providing bus service from and between New York City and John F. Kennedy International Airport and LaGuardia Airport. A major portion of Carey's business is in connection with permit and franchise arrangements it has negotiated with the Port Authority of New York and New Jersey ("Port Authority") and the City of New York. Carey attributes its "present financial difficulties ... [to] excessive operating costs. In significant part, these high costs of operation are attributable to the terms of [the] collective bargaining agreements ... covering the debtor's drivers and station personnel." Local Rule XI-2 Affidavit at 3. Carey further traces its present fiscal problems to a sixty-four day strike in 1982 by a majority of the employees covered by the Local 807 agreements. Carey indicates that the

---

1. This Decision and Order constitutes this Court's Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052 as made applicable to this contested matter by Bankruptcy Rule 9014.

loss of ridership during the strike has had long-term adverse effects which were only partially mitigated by the Debtor's successful efforts at recapturing passengers. Carey also points to its higher than average labor costs in support of its current application. Testimony was adduced to the effect that given its present cash flow situation, Carey anticipates its vendors refusing to provide services within the next thirty days.

The Debtor has produced evidence to substantiate its averment that it has negotiated with the Union pre- and post-petition and has instituted across the board economies.

Pre-petition, Carey and the Union engaged in negotiations that resulted in a Supplement modifying the terms of the collective bargaining agreements. The Supplement terms pertained to all full-time drivers above the contract minimum hired after July 1, 1984. They included: (1) establishment of a two-tier wage schedule permitting new drivers to start at a lower rate; 2) reduction of overtime pay and vacations; 3) elimination of sick days and reduction in fringe benefit contributions. In addition, Carey reduced its number of management, supervisory and non-union employees, and streamlined its operation. Carey's financial and operations officers testified that although savings were achieved by instituting the terms of the Supplement, further modifications in the collective bargaining agreements were needed. Negotiations with the Union during the first quarter of 1985, however, were fruitless.

Carey's post-petition proposal of necessary modifications included: (1) freezing all wages for second tier drivers and reducing hourly wages for first tier drivers for a period of three years; 2) reducing overtime, vacation and fringe benefit contributions; 3) eliminating sick days; 4) guaranteeing a minimum number of full-time drivers. The Union's rejection of this proposal prompted the present application. In addition, a majority of the drivers covered by the Local 807 collective bargaining agreement, believing themselves disaffected, organized into a Drivers *Ad Hoc* Committee ("the Drivers"). The Drivers, acting independently of their designated collective bargaining agent, for the most part boycotted the negotiating sessions between Carey and the Union. Ultimately they submitted counter-proposals, which are discussed below. After the third day of this hearing, the Union submitted its counter-proposal, similar to the one Carey had made (and the Union had rejected eighty-two to seven), pre-petition.

This Court must decide whether Carey has complied with the requirements of Code § 1113 which permits the bankruptcy court to approve an application to reject a collective bargaining agreement.

*Standard for Rejecting a Collective Bargaining Agreement*

Prior to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the standard in this Circuit for rejecting a collective bargaining agreement as an executory contract under former Code § 365(a) was whether the balance of equities favored rejection of a contract that was so onerous and burdensome as to effectively preclude an effective reorganization. *See Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.1975), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1976); *Truck Drivers Local Union No. 807 v. Bohack Corp.*, 541 F.2d 312 (2d Cir.1976); *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2d Cir.1975).

The Supreme Court's *Bildisco* decision resolved a conflict among the circuits as to the proper standard for rejecting a collective bargaining agreement. The *Bildisco* court rejected the *REA Express* standard and ruled that a bankruptcy court should permit rejection if the debtor can show that the contract burdens the estate and that, after careful scrutiny, the equities balance in favor of rejection. 104 S.Ct. at 1196. That decision further held that a debtor which unilaterally terminated or modified

provisions of the agreement prior to obtaining court approval to reject the collective bargaining agreement did not commit an unfair labor practice under the National Labor Relations Act. *Id.* at 1199.

Congress' response to *Bildisco* is contained in Code § 1113,[2] which in part overturns the Supreme Court's decision by forbidding unilateral rejection prior to a court hearing and ruling upon an application to reject a collective bargaining agreement. Furthermore, Code § 1113 requires the debtor to propose modifications to the union post-petition before seeking approval to reject its collective bargaining agreements. 11 U.S.C. § 1113(b)(1)(A). The proposal may contain only "those necessary modifications ... that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." *Id.* The debtor also must confer with the union representative in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement. 11 U.S.C. § 1113(b)(2). The standard for rejection is provided by § 1113(c), which allows the court to approve an application to reject a collective bargaining agreement only if it finds that the applicant has complied with § 1113(b)(1); the union representative has refused without good cause to accept the proposal; and the balance of equities *clearly* favors rejection. 11 U.S.C. § 1113(c).

■ Section 1113 was enacted reactively with little or no accompanying legislative history. Congress did not agree upon a Committee Report to accompany this section; there are only statements read into the Congressional Record by various members of Congress on the date BAFJA was enacted, June 29, 1984.

The Supreme Court in *Garcia v. United States*, —— U.S. ——, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984), recently reiterated its cautions against placing undue reliance on such legislative statements:

**2.** Code § 1113 provides in pertinent part:
(a) The debtor in possession may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession shall—
(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.
(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the [debtor] shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.
(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the [debtor] has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
(2) the authorized representative of the employees has refused to accept such proposal without good cause; and
(3) the balance of the equities clearly favors rejection of such agreement.
(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing....
(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing.... If the court does not rule on such application within thirty days after the date of the commencement of the hearing the [debtor] may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.
....
(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the committee reports on the bill, which "represent[ ] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Zuber v. Allen,* 396 U.S. 168, 186 [90 S.Ct. 314, 324, 24 L.Ed.2d 345] (1969). We have eschewed reliance on the passing comments of one member, *Weinberger v. Rossi,* 456 U.S. 25, 35 [102 S.Ct. 1510, 1517, 71 L.Ed.2d 715] (1982), and casual statements from the floor debates. *United States v. O'Brien* 391 U.S. 367, 385 [88 S.Ct. 1673, 1683, 20 L.Ed.2d 672] (1968); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766] (1980). In *O'Brien,* 391 U.S. at 385 [88 S.Ct. at 1683], we stated that Committee Reports are "more authoritative" than comments from the floor, and we expressed a similar preference in *Zuber,* 396 U.S. at 187 [90 S.Ct. at 325].[3]

*Id.,* 105 S.Ct. at 483.

The Court continued in a footnote:

As Justice Jackson stated:

"Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared.... [T]o select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions." *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 395–396 [71 S.Ct. 745, 751, 95 L.Ed. 1035] (1951) (concurring).

*Id.* n. 3.

Mindful of the foregoing counsel, this Court declines to give substantial weight to the aforementioned legislative statements and instead will be guided by the plain meaning of the statutory language, *Garcia,* 105 S.Ct. at 482, and by what little caselaw exists.

An early case construing § 1113, *In re American Provision Co.,* 44 B.R. 907 (Bankr.D.Minn.1984), extracts nine elements from the language of § 1113(b) and (c) that must be satisfied before a court may approve rejection of collective bargaining agreements.[3] Because the case provides a convenient framework in which to examine the Debtor's evidence, it will be utilized to that extent. It will be noted that, where appropriate, certain of *American Provision's* elements are dealt with in tandem.

1. *The debtor in possession must make a proposal to the union to modify the collective bargaining agreement based on the most complete and reliable information available at the time of the proposal.*

Carey's controller testified, and evidence was advanced, that the Debtor has operat-

---

**3.** The nine elements in Code § 1113(b) and (c) are:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.
2. The proposal must be based on the most complete and reliable information available at the time of the proposal.
3. The proposed modifications must be necessary to permit the reorganization of the debtor.
4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.
5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.
6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.
7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.
8. The Union must have refused to accept the proposal without good cause.
9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*In re American Provision Co.,* 44 B.R. 907, 908 (Bankr.D.Minn.1984).

ed at a loss since December 31, 1981. For the fiscal year ending February 28, 1985, the Debtor's loss amounted to approximately $2.5 million, and the Debtor projected a loss for the fiscal year ending Feb. 28, 1986 of $746,000.

Carey's controller testified that the proposal given to the Union was based upon the following cost savings, which were instituted pre-petition:

1. elimination of through service to Port Authority Bus Terminal and replacement of that service with a shuttle, resulting in a projected savings of $264,000 annually.

2. elimination of Carey's Pier 60 maintenance and storage facility as well as removal of its administrative, marketing and financial office to a less costly location, resulting in a net annual savings of $225,000.

3. settlement of a dispute with the Metropolitan Transportation Authority over the amount of tolls Carey paid at the Queens-Midtown Tunnel, resulting in an estimated annual savings of $264,000.

Carey's chief operating officer testified that pre-petition negotiations with the Port Authority, concerning equipment leases, license fees and other charges will result in a combined annual savings of about $886,-000. Carey's proposal to the Union was based, in addition, upon these savings.

In response to Carey's proposals, which would result in projected economies of $1.8 million for each of the next three fiscal years, the Union, after the third day of this hearing, submitted counter-proposals. These would result in estimated annual savings of $750,000. The Drivers, in fragmented fashion and dehors the negotiations being conducted by their certified representative, also submitted various counter-proposals in response to Carey.

The Drivers assert that Carey's failure to provide financial information about potential revenues to be gained from instituting a children's half-fare policy (children currently ride free of charge) as well as Carey's failure to provide information regarding intercompany transactions prevents this Court from finding that Carey's proposal complies with Code § 1113. The child half-fare policy was not contained in Carey's proposal.

In its discussion of § 1113's financial information requirement, the court in *In re Salt Creek Freightways*, 47 B.R. 835, 839 (Bankr.D.Wy.1985) stated:

The requirement of § 1113(b)(1)(B) is that the debtor provide such relevant information to the Union as is necessary for the Union to evaluate the *debtor's proposal*. It does not require, as the Union contends here, that the debtor also provide the Union, as part of its application to reject, with the written estimates necessary to evaluate the costs of the Union's own counter-proposals.

*Id.* (emphasis added). It is to be noted that the Union negotiating team in this case, with the aid of the informational provisions of § 1113, was in a better position than the boycotting drivers to evaluate intercompany transactions and fare policies.

While the *Salt Creek* decision dealt with Code § 1113(e), which permits interim changes in a collective bargaining agreement, this Court sees no policy difference behind the financial information requirement in the context of § 1113(b) and that required under § 1113(e). *See also In re K & B Mounting, Inc.*, 50 B.R. 460, (CCH) ¶ 70,515 at 86,968, 86,970 (Bankr.N.D.Ind. 1985) (debtor must provide union enough information to justify each of [debtor's] proposed modifications); *In re Allied Delivery System Co.*, 49 B.R. 700, (CCH) ¶ 70,506 at 86,939, 86,942 (Bankr.N.D.Ohio 1985).

While claiming an initial lack of supplied relevant financial information, the Union chose not to avail itself of Carey's offer to permit the Union's auditors to examine the Debtor's books and records on location. The Union never contended that Carey failed to supply financial information necessary to evaluate Carey's proposal. Indeed, most of the Union's rebuttal evidence was based upon management-supplied information. That the Union is not satisfied with the Debtor's proposals and that the Debtor did not adopt one of the Driver's counter-

proposals are insufficient bases to support a finding that Carey failed to provide relevant financial information. This Court finds that the relevant information developed at the evidentiary hearing was available pre-hearing.

2. *The proposed modifications must be necessary to permit the debtor's reorganization.*

The Debtor's financial and operating officers testified generally but credibly that the proposed modifications are necessary to rehabilitate the debtor into a competitive business enterprise in its particular market and to provide for a successful reorganization. The Union argued to the contrary without developing any factual contradiction. The Union's conclusory statements are insufficient to disprove that Carey's proposals are necessary.

Nevertheless, neither side discussed what Code § 1113(b)(1)(A) means by "necessary modifications." The *Allied Delivery* court concluded that " 'necessary' must be read as a term of lesser degree than 'essential' [used in § 1113(e) ]." 49 B.R. 700, ¶ 70,506 at 86,941. The court reasoned that "the subsequent requirement of good faith negotiation" would otherwise be "meaningless, since the debtor would thereby be subject to a finding that any substantial lessening of the demands made in the original proposal [would prove] that the original proposal's modifications were not 'necessary.' " *Id.* That court found the proposed modifications "necessary" based upon the fact that 87% of the debtor's *gross* revenues went toward union labor costs.

The *American Provision* court, on the other hand, found that a proposed savings amounting to 2% of the debtor's monthly operating expenses (it is unclear whether the figures used were gross or net) was not "necessary to permit the reorganization of the debtor." *Id.*, 44 B.R. at 910. It is unclear what proportion of the debtor's total revenues went toward union labor expenses in *American Provision*. While this Court agrees that where the proportion of labor costs to total revenues is as high as it

was in the *Allied Delivery* case, modifications are clearly necessary, it is hesitant to quantify what proportion of costs to revenues would be *de minimis* and thus not necessary to permit a reorganization. There can be no pat formula. Any analysis must be undertaken on a case by case basis with due consideration given to the nature of the business and industry patterns. In this way provisions dealing with wages and benefits that have a disproportionate financial impact on the debtor's business can be selectively addressed without the need for wholesale revision of every provision developed in prior bargaining. In other words, the § 1113 process is designed to encourage selective, *necessary* contract modification rather than a total elimination of all provisions in the collective bargaining agreement. Complete *de novo* negotiation would be wasteful and counterproductive.

The evidence presented by Carey indicates that "the proposed modifications [impact] upon the debtor's operations." *Salt Creek*, 47 B.R. at 838. The Union's failure to specifically contradict this evidence requires this Court to find that the proposed modifications are necessary for Carey's reorganization.

3. *The proposal must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.*

A significant number of management personnel have dual employment with the Debtor's affiliated companies. Carey's chief financial officers testified that the percentage of managerial and supervisory salaries allocated to Carey is smaller than the percentage of time spent by those personnel on Carey business. Testimony was also adduced indicating that Carey's pay scale for its managers and supervisors was lower than comparable rates in similar enterprises. Pre-petition, Carey reduced the number of these personnel from twenty-three to fifteen. Two of these personnel received raises of $4,000 and $1,600 in fiscal 1985, reflecting increased responsibilities. Carey maintains five company automobiles for these personnel. In addition,

Carey made the following pre-petition reductions and modifications: decreased the number of its other non-union personnel from fifteen to twelve; reduced the number of people in its financial group from eight to six as a result of consolidating its accounting operations with those of one of its affiliates; reduced the number of airport customer service agents; and made fare increases.

The Union's main objection to Carey's proposal is that its employees bear the brunt, if not all, of the cost-cutting measures in Carey's proposal. In addition to the salary raises and company cars, the Union notes that in 1984, Carey made a 6% contribution to the profit sharing plan enjoyed by eight management personnel, while the only increase enjoyed by Union members for the remainder of the term of the collective bargaining agreement (8 months) is a 10 cent per hour increase in Pension Fund contributions. The Union asserts that the "fair and equitable" language in § 1113(b)(1)(A) requires this Court to deny Carey's motion because its proposal does not include concomitant wage cuts and other economies for management, supervisory and other non-union personnel.

Equity requires management to tighten its belt along with labor, and the record herein supports a finding that Carey has complied with this requirement. These pruning efforts may occur prior to or concurrent with the Chapter 11 filing.

It is rare that management approaches labor seeking economic concessions without being able to demonstrate that it has already taken steps to cut excess costs and overhead. Section 1113(b)(1)(A) requires the debtor who seeks to reject a collective bargaining agreement to "make a proposal to the authorized representative of the employees covered by [the collective bargaining agreement] ... which provides for those necessary modifications in the employees benefits and protections ... and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A). In the few reported decisions to date, the courts have considered whether all of the "'affected parties' [are] shouldering a [*proportionate*] burden of the debtor's cost-cutting efforts." *Salt Creek*, 47 B.R. at 839. Although Carey has not reduced the wages and salaries of its remaining managerial and supervisory employees, it has gradually reduced the number of these personnel by approximately sixty-five percent, which has certainly resulted in economies of scale. Nowhere does the Union demonstrate that Carey's administrative expenses are disproportionate to an operation of this kind, or that management was enjoying an extravagant corporate lifestyle. It merely calls management costs "excessive," by selectively highlighting purported examples. To the contrary, counsel for the Union conceded in his post-trial summation that the two person management raises in 1985 "were not the biggest," Tr. at 40 (May 29, 1985) and did not contradict testimony that the value of services received in some instances exceeded Carey's allocable share of salary. As one court stated, "[f]air and equitable treatment does not of necessity mean identical or equal treatment." *Allied Delivery*, 49 B.R. at 700, (CCH) ¶ 70,506 at 86,942.[4]

**4.** The court in *In re Russell*, 48 B.R. 241, 12 B.C.D. 1192, 1194 (Bankr.W.D.Va.1985), a case decided under the interim provision § 1113(e), exercised what this Court believes may be an unsanctioned exercise of discretion in forcing management givebacks. The *Russell* court ordered management as well as labor to take ninety-day salary reductions, even though the debtor's proposal contained only union salary cuts. It must be noted that under 1113(e), the court has more discretion than under § 1113(b) because the former provision is only a temporary measure, whereas an order permitting a debtor to reject a collective bargaining agreement is permanent. This Court agrees that where management has failed to make concommitant belt-tightening cuts in its compensation, this fact may clearly tip the equities in favor of denying a motion to reject a collective bargaining agreement under § 1113(b) and (c) or for interim relief under (e). However, nothing in § 1113 affirmatively empowers the court to order management to reduce salaries involuntarily.

Other sections of the Code are available to a party in interest to monitor profligacy on the part of management.

Carey's evidence of efforts at streamlining its management and supervisory staff, its agreements negotiated with its creditors the Port Authority and the MTA, and the concessions negotiated with the union covering its mechanics, District 15, all lead ineluctably to the conclusion that Carey's proposal treats all affected parties fairly and equitably, without placing a disproportionate burden on the members of the Union.

4. *The debtor must meet with the Union at reasonable times between the making of its proposal and the time of the hearing on the application to reject the collective bargaining agreement.*

There is no question that Carey complied with this requirement. Although Carey and the Union met at least nine times between the date the Debtor made its proposal and the date this hearing concluded, the Drivers, apparently acting on the advice of non-union affiliated counsel, "stonewalled" these meetings. *See* Debtor's Ex. 10 (letter from Local 807 President to Union members). That the negotiating sessions were not fruitful is irrelevant and perhaps inevitable.

5. *The debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.*

The Union bases its contention that Carey failed to confer in good faith on the fact that Carey rejected the Union's last minute counter-proposal. Furthermore, Carey's testimony stands uncontradicted that the Union's counter-proposal does not contain sufficient savings to permit a reorganization. The parties' failure to reach an agreement in this case appears to be partially the result of the internecine conflict involving the Union and its membership.

Regarding the good faith negotiating requirement of § 1113, the court noted in *Salt Creek*, "the failure to reach agreement appears to be the result of the difficultness of the task, rather than the lack of 'good faith' of either party." 47 B.R. at 840. The *American Provision* court stated that "once the debtor has shown that it has met with the Union representatives, it is incumbent upon the Union to produce evidence that the debtor did not confer in good faith." 44 B.R. at 910.

Carey has discharged its burdens of production and persuasion; the Union has produced no credible evidence demonstrating Carey's bad faith.

6. *The Union must have refused to accept the proposal without good cause.*

Carey asserts that it has discharged its burden of proof on this issue merely by pointing to the Union's counter-proposal. Because there is no Committee Report accompanying Code § 1113, the meaning of "good cause" must be found from the statutory language and the sparse caselaw.

The court in *K & B Mounting* found that the Union had good cause to refuse to accept the debtor's proposal where the debtor failed to provide sufficient financial information and failed to make a proposal which treated all parties fairly and equitably. *Id.*, 49 B.R. 700, (CCH) ¶ 70, 515 at 86,974. The *Allied Delivery* court enunciated a definition of "good cause" that flows from the requirements of § 1113(b), stating: "If the proposal is necessary and is fair and equitable ... then the Union's refusal to accept it on the basis that the proposal is unjust ... is not for good cause." *Id.*, 49 B.R. 700, (CCH) ¶ 70, 506 at 86,942. *See also Salt Creek*, 47 B.R. at 841. The *Salt Creek* court stated:

> [I]n order to approve an application for rejection, it is not necessary to find that a Union has rejected a debtor's proposal in 'bad faith' or for some contrary motive. In fact, the Union may often have a principled reason for deciding to reject the debtor's proposal and which may, when viewed subjectively and from the viewpoint of its self-interest, be a perfectly good reason. However, the court must review the Union's rejection utilizing an objective standard which narrowly construes the phrase 'without good cause' in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses.

47 B.R. at 840.

As in the *Salt Creek* case, there is no testimony concerning the Union's specific

reasons for refusing to accept Carey's proposal. Having found that Carey's proposal contained necessary modifications and was fair and equitable when all the economies made by Carey pre-petition are combined with those proposed post-petition, it must be found that the Union's refusal to accept Carey's proposal was without good cause within the meaning of the statute.

7. *The balance of the equities must clearly favor rejection of the collective bargaining agreement.*

Carey has produced testimony tending to show that its previous pattern of annual losses, its projected although decreased loss for the coming fiscal year, its excessive labor costs and its tight cash flow situation formed the basis for filing its petition. The Debtor's financial officers have testified that the liquidation value of Carey is about $250,000, which would be consumed by administration and liquidation costs, leaving little if anything for unsecured creditors and equity shareholders. Further, Carey indicated that $70,000 of pre-petition claims owed to the Union's pension and welfare funds would exhaust the priority treatment afforded these claims under Code § 507(a)(3) and (4). Carey has also indicated its recognition of the fact that if its Application is granted, it will still have a duty to bargain in good faith with the Union toward achieving a new contract. Finally, if Carey were forced to liquidate, the Union members would be unemployed. The Union has not produced any credible rebuttal evidence.

The balancing of the equities test is largely a codification of the standard for rejecting a collective bargaining agreement adopted by the Supreme Court in *Bildisco.* *See K & B Mounting,* 49 B.R. 700, (CCH) ¶ 70, 515 at 86,972; *Salt Creek,* 47 B.R. at 841. The Supreme Court indicated that this test is "higher than that of the 'business judgment' rule, but a lesser one than that embodied in ... *REA Express.*" *Bildisco,* 104 S.Ct. at 1196. This "test is a broad equitable one, lacking rigidity." *K & B Mounting,* 49 B.R. 700, (CCH) ¶ 70, 515 at 86,972. *See also In re Brada Miller*

*Freight Systems, Inc.,* 702 F.2d 890 (11th Cir.1983); *Kevin Steel,* 519 F.2d at 707. By inserting language in § 1113(c)(3) permitting rejection only where the balance of the equities "clearly" favors it, "Congress intended to clarify that rejection was only appropriate where the equities balance decidedly in favor of rejection." *Salt Creek,* 47 B.R. at 841 (citation omitted). The equities to be balanced involve

the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative difference between the types of hardship each may face.

*Id.* at 841 (citing *Bildisco,* 104 S.Ct. at 1197).

In balancing the equities, "a Bankruptcy Court must focus on the goal of Chapter 11 when considering those equities, and must consider only how the equities relate to the success [and policy] of ... reorganization." *Id.*

Factors found relevant to this balancing test by the *Salt Creek* court included: 1) whether the policy of reorganization will be furthered by the rejection of the collective bargaining agreement; 2) whether the Union asserted that the debtor filed solely to disencumber itself from the collective bargaining agreement; and 3) how damage claims resulting from the rejection would be treated under Code § 502(c). While this Court concurs that the first and third factors above described are relevant for purposes of § 1113, it is loathe to attach any significance to whether or not the Union asserts a claim that the case was filed solely to jettison its union contract. That issue is more appropriate fodder for dismissal considerations under § 1112(b) of the Code, or for a motion by a party in interest

such as the Union here, *see In re Johns-Manville Corp.*, 36 B.R. 743, 747 (Bankr.S. D.N.Y.1984) ("term 'party in interest' must be construed broadly"), to appoint a trustee or examiner under Code § 1104. The *Salt Creek* court's willingness to emphasize an unadvanced assertion is unjustified and dubious at best. Unlike the *Salt Creek* union, the Union in the case at bar did assert that Carey filed for Chapter 11 solely to reject its collective bargaining agreement; in fact, nothing in the record supports this assertion.

Code § 502(c) requires claims for damages resulting from the rejection of an executory contract to be estimated for purposes of determining allowed claims. As to the treatment of claims under § 502(c), Carey has indicated that because of the priority scheme of the Code and the small projected liquidation value of the company, such claims would not be likely to receive a dividend.

A final factor to be considered is that "[t]he impact of the cost savings which can be realized from further cutting the non-union employees would be minute...." *Allied Delivery*, 49 B.R. 700, (CCH) ¶ 70, 506 at 86,942. Similar to the conclusion reached by that court is the one reached herein: "The evidence ... clearly demonstrate[s] that the financial drain on this debtor is enormous. The cutting of labor costs is essential. There has been no showing of any other area in which substantial savings could be realized by the debtor." *Id.*, 49 B.R. 700, (CCH) ¶ 70, 506 at 86,943.

Carey attests that its labor costs were approximately 60% higher than the industry average. *See* Local Rule XI–2 Affidavit. Because 66% of Carey's employees are unionized there is no way to avoid the conclusion that a substantial proportion of the Debtor's cost-saving measures will have to be borne by Local 807 members. In balancing the equities, then, and having considered all the factors of Code § 1113 as

reiterated by the court in *American Provision,* this Court concludes that the balance of the equities clearly favors rejection of Carey's collective bargaining agreements with Local 807.

*Conclusion*

 Based upon the testimony and evidence adduced at the hearing [5] on this Application and the record in this case, the Court finds that the special requirements for rejection of a collective bargaining agreement have been met. The Debtor's Application for rejection pursuant to § 1113 of the Bankruptcy Code is granted.

It is so ordered.

---

5. The hearings were held on May 16, 21, 22, 24 and 29 in day and evening sessions to accomodate the timing commands of § 1113(d)(2). Curiously, this section permits the debtor to unilaterally modify the agreement pending the Court's ruling if the Court does not render its decision within thirty days from the commencement of the hearing. This would apparently revive the *Bildisco* holding on unilateral action by the debtor, at least temporarily.