**In re BIG SKY TRANSPORTATION CO., a Montana corporation, d/b/a Big Sky Airlines, Northwest Airlink and Big Sky Transco, Debtor.**

Bankruptcy No. 89–10308–011.

United States Bankruptcy Court,
D. Montana.

Aug. 8, 1989.

Joel E. Guthals, Billings, Mont., for debtor.

John A. Edmond, Maria Makris–Gouvas, Guerrieri, Edmond & James, Washington, D.C. and Turner C. Graybill, Great Falls, Mont., for union.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, the Debtor filed a motion on June 14, 1989, to reject its executory collective bargaining agreement with the International Association of Machinists and Aerospace Workers (IAM), which represents 12 of the 26 mechanics employed by the Debtor. The labor agreement was entered into November 22, 1988. The Debtor seeks to reject the agreement for a period of 180 days in order to implement wage and other cost reductions approximating $6,846.00 per month for mechanics. Hearing on the motion was held on June 29, 1989, and again on July 24, 1989. At the June 29, 1989, hearing, the Court directed the union to formally respond in writing to the Debtor's wage and cost proposal and directed the parties to negotiate before July 24, 1989, the date set for final hearing. The parties met between the two dates, and failed to come to a complete resolution of the proposal, so that the union rejected the wage reduction by a unanimous vote. The Court on June 29, 1989, ordered interim relief in favor of the Debtor in the form of postponing wage increases due July 1, 1989. That order has been appealed by the IAM, but such appeal does not deprive this Court of jurisdiction over the present motion since the appeal of the interim order is non-appealable. *In re Landmark Hotel & Casino, Inc. (Landmark Hotel & Casino, Inc. v. Local Joint Exec. Bd. of Las Vegas Culinary Workers, Local 226 et al.),* 872 F.2d 857 (9th Cir. 1989).

On March 20, 1989, the Debtor wrote IAM requesting a meeting between the parties to "discuss necessary concessions" of the labor agreement. By telephone response, the Debtor and a union representative met March 24, 1989, at which meeting,

a review of the proposed written concessions, delivered at the meeting, was had. Revised concessions, dealing with wage reduction, postponement of wage increases, and other cost items, was received by a letter to the union on March 31, 1989. Beginning April 13, 1989, counsel for the respective parties began an exchange of relevant financial information, requested by IAM, concerning the Debtor's past and present operations. Information was still being exchanged as late as June 26, 1989, three days before the hearing on Debtor's motion to reject the contract. At the first hearing, the Debtor introduced financial data which shows that other employee bargaining units and non-union help had agreed to wage concessions of 10 to 17% which totaled $38,064.00 per month. The Debtor's total payroll expense, by virtue of these agreements, decreased from $403,167.00 in March, 1989, to $325,139.00 in May, 1989. In April, 1989, the Debtor sustained an operating loss based on revenues of $891,334.00 of $225,398.00. By June, 1989, its operating loss decreased to $12,331.00, but its revenues had increased substantially to $1,086,161.00, the beginning of the peak travel period. That peak travel period will last until after September 1, 1989, when operating revenues are expected to again decrease. The thrust of Debtor's position is that it must reduce operating expenses in order to sustain a positive cash flow, as it has no reserve to sustain continuing operational losses. The union maintains the Debtor's financial dilemma arises from expanded air service, with increase in planes, without attendant increase in passengers. This fact is exacerbated by Debtor's present contract difficulties with Northwest Airlines, a major air carrier, with whom Debtor shares codes, joint fares, and advertising programs.

After the June 29, 1989, hearing, the parties continued an aggressive bargaining posture, which resulted in exchange of additional financial information in the form of Debtor's past business plans, face to face meetings, and a final union ballot. The union representatives testified they reject-

ed the Debtor's proposal because their members could not afford the decrease in wages, which it contends is already substandard in the industry, in the face of an increase in each employee's health benefit premiums of at least $26.00 per month. The best concession offered by the union was a 90 day freeze on the wage increase, with a "snap-back" provision if the company becomes profitable.[1] The Union also strongly contends that other major creditors of the Debtor, except for one leasing creditor, have made only interim concessions in the form of reduction of monthly lease payments, which then will return to normal contract payment on successful reorganization, so that with the one exception, all payments on aircraft and parts snap-back upon confirmation of a Plan to the original contract terms, while the concessions asked of the union do not enjoy such treatment. No Plan of Reorganization has yet been filed by the Debtor regarding the treatment of its creditors. The union representatives concede that during the negotiation sessions of July 13 and 19, 1989, all financial questions were answered, so that the union members were in a position to ballot on July 19, 1989. None of the 14 non-union members cast a ballot. An individual union member may voluntarily agree to the concessions if he or she so chooses. The union's consultant testified and advanced the opinion that labor costs were not the prime reason for the Debtor's present financial condition, but rather the Debtor must increase passenger travel and stabilize the Northwest share agreement. Thus, the union contends Big Sky can successfully emerge from reorganization without wage concessions if its revenues are brought into line with present operating costs. The Debtor contends that even if revenues are increased, as has occurred in the peak travel months, cash flow will still be negative. The union's consultant offered no concrete suggestions on how Big Sky would increase its passenger travel and revenues.

Since Section 1113 was added to the Code in 1984, following *NLRB v. Bildisco &*

---

**1.** All other issues except the wage reduction and   July 1, 1989, wage increase were resolved.

*Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), it is generally agreed among the courts that a nine step approach must be satisfied to allow rejection of a collective bargaining agreement in a Chapter 11 case.[2] The nine elements have been suggested in *American Provision Co.,* 44 B.R. 907 (Bankr.Minne.1984), and applied, with some modifications, in *In re Salt Creek Freightways,* 47 B.R. 835 (Bankr. Wyo.1985), and *In re Carey Transportation, Inc.,* 50 B.R. 203 (Bankr.S.D.N.Y. 1985), aff'd 816 F.2d 82 (2d Cir.1987). The nine requirements expressed in *American Provision Co.,* supra, at 909, are:

"While § 1113 is not a masterpiece of draftsmanship, I think nine requirements for court approval of the rejection of collective bargaining agreements can be gleaned from § 1113.

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement."

In explaining element 5, the Court noted that it was similar to element 2, but that element 2 dictates that the proposal be *based* on relevant financial information while the fifth requirement requires the Debtor to *provide* that information to the union. *Id.,* ftn. 2 at 909. The Debtor bears the ultimate burden of persuasion.

■ Taking each element based on the evidence produced at the hearing, I conclude Items 1, 2, 5, 6 and 7 have been satisfied by the Debtor. Once the proposal for concessions was made, the Debtor supplied its financial data and business plans to the union, met with union representatives and members to discuss and explain the data before the conclusion of the final hearing on July 24, 1989, so that the Debtor's efforts were in good faith. The union then felt satisfied enough to ballot on the proposal and rejected it. The union has produced no credible evidence to the contrary. Thus, the issues revolve upon the remaining elements, namely, No. 3, 4, 8 and 9. I take each separately.

No. 3. The proposed modifications must be necessary to permit the reorganization of the Debtor. I adopt the explanation provided by the Second Circuit in *Truck Drivers Local 807 v. Carey Transp. Co.,* 816 F.2d at 89–90:

"Local 807 asks us to adopt the Third Circuit's reasoning, arguing that the post-petition proposal must fail because it sought more than break-even cost reductions, because the proposed three year term was too long in relation to the eight months remaining under the existing agreement, and because it did not provide for wages and benefits to 'snapback' in the event that Carey's financial performance improved. *See Wheeling–Pittsburgh Steel [v. United Steelworkers of America],* 791 F.2d [1074] at 1089–90 [ (3rd Cir.1986) ]. We decline to do so."

**2.** The history of § 1113 is explained in *In re Century Brass Products, Inc.,* 795 F.2d 265 (2nd Cir.1986).

"First of all, the legislative history strongly suggests that 'necessary' should not be equated with 'essential' or bare minimum.

\* \* \* \* \* \*

In making the decision whether to permit the debtor to reject its bargaining agreement, however, the court must consider whether rejection would increase the likelihood of successful reorganization. A final reorganization plan, in turn, can be confirmed only if the court determines that neither liquidation nor a need for further reorganization is likely to follow. *Id*. [*In re Royal Composing Room*, 62 B.R. 403] at 417 [ (Bkrtcy.S.D.N.Y.1986) ] (quoting Bankr.Code § 1129(a)(11)). Thus, in virtually every case, it becomes impossible to weigh necessity as to reorganization without looking into the debtor's ultimate future and estimating what the debtor needs to attain financial health. As the *Royal Composing Room*, [62 B.R. 403], court phrased it, 'A debtor can live on water alone for a short time but over the long haul it needs food to sustain itself and retain its vigor'. *Id*. at 418.

\* \* \* \* \* \*

In sum, we conclude that the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."

The Bankruptcy Court in *Carey*, 50 B.R. at 209, stated there is no pat formula to quantify what portion of labor costs in relation to revenues must be shown to show that reduction is necessary. A case-by-case analysis is justified. In the case *sub judice*, the total dollar reduction sought by the debtor from all personnel was 10 to 17% which equates to $44,910.00 per month. Management, pilots, station operators and others have all agreed to a reduction total-ling $38,064.00 per month. This equates to about 3.8% reduction of total operating expenses. But percentages can be deceiving, and one cannot pay bills on a percentage basis. The hard dollar amount of reduction is critical to a positive cash flow operation, and the union introduced no credible evidence to the contrary. Certainly cost reductions are essential for a successful reorganization, since industry competition leaves the area of increased revenues quite doubtful and speculative. I conclude the Debtor has sustained its burden of persuasion on this element.

No. 4. Requires that the proposed modification must assure that all creditors and Debtor and all affected parties are treated fairly and equitably. There must be fairness to all parties so as "to spread the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree". *Century Brass*, 795 F.2d at 273. Here, we do not have a situation such as in *Carey*, supra, where managers and non-union employees received no pay cuts, but received increased responsibilities, while the union members took a direct pay cut. Rather, Big Sky's proposal cuts all employees either 10% if the salary for the pay period is less than $500.00 and 17% if the salary exceeds $500.00. All have agreed except IAM members. IAM says its pay rate is already substandard, in wages and benefits. Management retorts that a recognized industry publication of mechanic's wages among regional air carriers (Mesaba, Big Sky, Rocky Mtn. Airway, Skywest, and United Express) shows 5th year mechanics range from $11.48[3] per hour (Big Sky) on the low end to $12.83 per hour (Rocky Mtn.) on the high side, with an average wage among these regional carriers of $12.22 per hour. At the starting end, the survey range runs from $7.75 (Mesaba) to $10.12 per hour (Rocky Mtn.). Big Sky's contract, however, calls for $6.38 per hour, which was a prepetition concession concurred in by the union. Under Big Sky's proposal the wage rate will be cut 17%,

---

**3.** The base wage is $10.63 per hour in the IAM contract, which is also subject to payment of premium time and shift differential.

which would bring the 5th year mechanic to $9.53 per hour, or about 22% below the industry average. Certainty of maintaining an experienced work force at that wage level is doubtful, as the union contends. Thus the attendant increase in health insurance cost, coupled with the proposed wage reduction, is the principal basis for the union's rejection of the company's proposal. Therefore, element 8 bears directly on element 4. The union used this argument as its good cause for rejection of the proposal.

One other matter needs noting. Most of Big Sky's aircraft and accessories are under lease or security agreements with suppliers and financiers. As noted above, only one lessor agreed to monthly reduction in lease payments without any return or snap-back to the original contract terms. All other reductions snap-back upon confirmation, and the reduction is ultimately paid by Big Sky over time. This may be also true as to personnel reductions, since the proposed reductions extend for a period of 180 days. But creditors, either secured or with executory contracts, are provided different treatment under the Bankruptcy Code. In the case of an executory contract, i.e., an unexpired lease, the contract can be assumed upon confirmation only if the default is cured. § 365. And in the case of the secured creditors, they must receive under the Plan the present value of their secured claim in deferred cash payments if they object to the Plan. § 1129(b)(2)(A).

■ Fair and equitable treatment does not, of necessity, mean identical or equal treatment. *Carey,* supra, 50 B.R. at 210, citing *Allied Delivery Systems,* 49 B.R. 700 (Bankr.Ohio 1985). Under the facts in this case, the union has not carried the day that the majority of secured creditors simply have not and will not shoulder any burden of spreading cost-cutting efforts. Stated differently, the Debtor has demonstrated to the satisfaction of this Court, considering the applicable Bankruptcy Code requirements, that all parties in some form or another, are presently assisting in the reorganization effort. The major creditors, except one, have offered the Debtor interim relief, and the relief sought from IAM is likewise interim, extending for 180 days. I am mindful that other employees have voluntarily met the challenge to reduce costs.[4] In the posture of the present motion, absent a Plan of Reorganization, it is clear the union, after negotiation, rejected the proposal for lack of good cause, in part, because the ostensible lack of creditor cost sharing misconceived the treatment such creditors may be afforded under the Bankruptcy Code. Such is true even if the union wage scale falls substantially below industry patterns for a period of time. I am sympathetic with the union's efforts and desire to protect its members, but feel the language and intent of § 1113 simply has been met by the Debtor under elements 4 and 8.

No. 9. In light of the foregoing, the balance of equities does favor rejection of the wage benefit portion of the collective bargaining agreement,[5] when one focuses, as one must, on the ultimate goal of Chapter 11. *Bildisco,* 465 U.S. at 527, 104 S.Ct. at 1196. As stated in *Salt Creek,* supra, 47 B.R. at 841, citing *Bildisco:*

"In *Bildisco,* the Supreme Court described the 'balance of the equities' test as 'higher than that of the "business judgment" rule, but a lesser one than that embodied in the *[Brotherhood of Railway, Airline and Steamship Clerks v.] REA Express [,*523 F.2d 164 (2nd Cir. 1975) ]' case. 104 S.Ct. at 1196. In striking the balance in this test, the Supreme Court stated that a Bankruptcy Court must focus on the goal of Chapter 11 when considering those equities, and must consider only how the equities relate to the success of the reorganization. *Id.* at 1197.

The Supreme Court further stated,

---

4. The pilots' association says it will continue its wage concession only if IAM accepts its share of the responsibility. If not, evidently the pilots' concession will be null and void. I disregard such threat in this Order.

5. *American Provision* holds that if the Debtor's rejection of its collective bargaining agreement was approved, such rejection would not affect the union's status as the authorized representative of those employees nor the Debtor's obligation to bargain. *Id.* at 911.

Determining what could constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative difference between the types of hardship each may face. *Id.* at 1197."

Creditor participation in cost cutting and burden sharing may yet have to be more substantial and meaningful to save the company from liquidation. This order does not foreclose those efforts. Certainly other personnel are to be applauded in their effort to realistically meet management proposals. For it is clear from the record, and largely undisputed, that the historic pattern of losses sustained by the Debtor, coupled with its precarious legal position with Northwest Airlines, demand cost cutting is essential to increase cash flow so as to maintain a viable operation. The company's president testified the Debtor is now at a very marginal state in its financial affairs. Nor are labor costs the blame. Clearly lack of revenues is the major factor. But cost cutting is essential when revenues do not meet the required level. The Company has reduced capacity and raised its fares, so that the attack against further decline is coming from both sides of the balance sheet. Liquidation would leave nothing for any employee and unsecured creditors would likely suffer a washout. The balance of equities favors an across the board reduction in labor costs from all employees.

IT IS ORDERED Debtor's motion to reject the collective bargaining agreement dated November 22, 1988, with IAM is granted in accordance with the proposals negotiated between the parties and as to wage reductions and postponement of wage increases upon the condition, never-

theless, that the duration of wage reductions is 180 days as proposed by the Debtor from the date of this Order.