**In re INDIANA GROCERY CO., INC., Debtor.**

**Bankruptcy No. IP89–4498RA V.**

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

Feb. 5, 1990.

Charles E. Greer, David J. Mallon, Peggy J. Naile, Ice Miller Donadio & Ryan, Indianapolis, Ind., for debtor.

Jonathan D. Karmel, Rosenfeld & Karmel, Chicago, Ill., for Union.

## ORDER DENYING MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENT

RICHARD W. VANDIVIER, Bankruptcy Judge.

This matter comes before the Court on the Motion for Approval of Rejection of Collective Bargaining Agreement with Local 550R, United Food & Commercial Workers' Union ("the Motion to Reject"), filed on October 5, 1989, by the Debtor, Indiana Grocery Co., Inc. ("IGC"). A hearing was held on November 27 and 28, 1989. The Court now denies the Motion to Reject on the following findings of fact and conclusions of law.

### Findings of Fact

1. IGC, which owns and operates unionized retail grocery stores, filed for relief under Chapter 11 of the Bankruptcy Code on June 22, 1989, and continues operations as debtor in possession. On the same date, Allied Grocers, Inc. ("Allied"), a grocery warehouse operation, and Preston–Safeway, Inc. ("Preston–Safeway"), which owns and operates non-union retail grocery stores, filed for relief under Chapter 11. IGC is related through common ownership and control to Allied and Preston–Safeway, as well as to Preston–Safeway Management, Inc., which pays the compensation for the top management of the other three companies. Allied is the chief wholesale supplier of IGC and Preston–Safeway. The shareholders of Allied, IGC and Preston–Safeway ("the Debtors") are Ethan I. Jackson, Franklin L. Jackson, Lowell A. Peters, and Brady R. Justice, Jr., all of whom served in top management of one or more of the Debtors. All three Debtors showed, as the the petition date, George W. Davis ("Davis") as Executive Vice President—Chief Financial Officer, Secretary and Treasurer, and Douglas R. Voris ("Voris") as Executive Vice President—Administration. Lowell A. Peters ("Peters") was IGC's Chairman of the Board.

2. United Food & Commercial Workers ("UFCW"), Local 550R ("Local 550R" or "the union") represent the employees of four IGC stores, located in Vincennes, Indiana ("Vincennes"), Terre Haute, Indiana ("Terre Haute South"), Brazil, Indiana ("Brazil"), and Danville, Illinois ("Danville"). Employees of the other Indiana stores, approximately 20 in number now, are represented by UFCW Local 917 ("Local 917"), and employees of two stores in Peoria, Illinois, are represented by UFCW Local 536 ("Local 536"). The locals represent both the grocery and meat department employees and negotiate separate collective bargaining agreements ("CBAs") for each department. Jim Jacobs ("Jacobs") is the president of Local 550R.

3. The collective bargaining agreements with Locals 550R and 917 expired in November, 1988, and the parties were unable to reach a new agreement during negotiations in late summer and fall. After the CBAs expired, employees represented by both locals engaged in strikes against IGC. The parties reached agreement on new

CBAs on December 16, 1988, which ended the strikes, and these agreements were reduced to writing and signed by Jacobs and Voris on January 19, 1989.

4. During summer and fall of 1988, Allied was trying to negotiate financing with its major lender, Security Pacific Business Credit, Inc. ("Security Pacific"). According to testimony from IGC officials, Security Pacific was hesitant to continue financing Allied because of the poor financial performance of IGC, a major customer and major debtor of Allied's. Security Pacific insisted that IGC meet a pro forma ("the fall 1988 pro forma"), which included reduction of its labor costs by 16.5%, as a condition for further financing. According to David Mattingly ("Mattingly"), one of IGC's attorneys, 16.5% would be a break even reduction. At least some of IGC's management knew of this requirement at the time of its negotiations with Locals 917 and 500R in fall of 1988.

5. The new CBAs with Locals 917 and 550R were similar in their terms. Jacobs testified that during contract negotiations no one from IGC mentioned the 16.5% labor cost reduction Security Pacific required. Mattingly testified that there was an overall decrease in wage rates compared to the old CBAs, but those cuts alone did not amount to the needed 16.5%. Included in the new CBAs was a provision entitled "Special Economic Relief for Twelve Stores" ("the SER provision"), whereby IGC could, between 30 and 90 days after ratification of the CBAs, request special economic relief ("SER") from any of twelve specified stores if IGC determined that those stores had not achieved "acceptable sales levels", in order to avoid closing the stores. If IGC requested SER at a store, the parties were to negotiate adjustments to the CBA necessary to keep the store open. If the store's employees accepted the SER, the adjustments would remain in effect for the duration of the CBA. If the employees rejected the SER, the store would be closed. Among the twelve listed stores were three of the four represented by Local 550R—Danville, Brazil and Terre Haute South. There is disagreement on what was meant by "acceptable sales levels". Local 550R contends it meant prestrike sales levels, while IGC contends it meant levels to make the stores profitable.

6. Soon after the new CBAs took effect, IGC began asking for SER from stores on the list of twelve. The employees of some stores in the jurisdiction of Local 917 accepted wage reductions and remained open. Six stores in which the employees rejected the wage reductions were closed. On January 20, 1989, IGC proposed SER for the first store in Local 550R's jurisdiction— Danville. Jacobs was shocked because he thought that store was exceeding prestrike sales levels. The Danville employees voted on it on February 22, 1989. Local 550R reported that the vote was against the proposal, but IGC believed the vote was in favor of it and therefore implemented the SER provisions at Danville. On March 10, 1989, IGC presented SER proposals for the Brazil and Terre Haute South stores, Local 550R officials refused to participate in in presenting or voting on the proposals, IGC conducted votes, and believing that the employees at both stores had approved the proposals, IGC implemented the SER provisions at Brazil and Terre Haute South.

7. Local 550R brought grievance and unfair labor practice actions against IGC relating to its actions at the Danville, Brazil and Terre Haute South stores, and as a result, on June 30, 1989, the NLRB issued a consolidated complaint against IGC, which action is pending before the NLRB ("the NLRB action"). It is Local 550R's contention that the original terms of the CBA are still in force and that IGC is liable to employees of these three stores for the difference between the rates under the CBA ("the CBA rates") and the rates implemented under the SER proposals ("the SER rates"). Such potential liability continues to accrue as long as the employees receive the SER rates.

8. According to testimony from IGC officials, in spring 1989, IGC and Local 917 negotiated across the board wage reductions at Local 917 stores in order to keep the stores open and allow IGC to survive. Although there had been animosity before, both sides saw such concessions to be in

their mutual best interests, and on May 1, 1989, the membership of Local 917 accepted a SER addendum to their CBA which covered all those stores ("the SER addendum"). Wage reduction provisions were similar to those in the earlier SER proposals at individual stores. Included was a snap-back Provision, whereby the parties would negotiate to recover the concessions if the stores were achieving contributions to overhead ("CTO") of 2% or more on specified dates. Any excess over 2% was to be shared equally between IGC and the employees.

9. Near the time the Debtors filed for bankruptcy relief, IGC reported to Security Pacific that the required labor cost reductions had been achieved. Security Pacific agreed to continue its financing of Allied (with a principal debt to Security Pacific of approximately $19.3 million on the petition date, approximately $4.3 million of which was owning on a term note, with the remainder owing on a $30 million revolving line of credit) and to extend new financing of $4.6 million to Preston–Safeway and IGC. These agreements were finalized and approved postpetition by this Court.

10. It is unclear whether Security Pacific knew at the time it agreed to further financing that Local 550R was not party to the SER addendum Local 917 had approved. Davis testified that Local 917 received more attention because its greater number of stores had a greater impact on IGC. If IGC believed Local 550R would meekly fall in line, it soon discovered otherwise.

11. In May, 1989, IGC contacted Local 550R officials requesting a meeting to discuss an SER addendum like the one approved by Local 917 employees. The tensions between IGC and Local 550R only increased in the next few months. The parties were unable to schedule a meeting until July 14, 1989, at which time Peters, Mattingly, Jacobs, and Jonathan D. Karmel ("Karmel"), an attorney for Local 550R, met in Indianapolis in the offices of Ice Miller Donadio & Ryan ("Ice Miller") in Indianapolis. Mattingly, an attorney with Ice Miller, was one of IGC's attorneys,

although not a labor specialist. Peters, as chairman of IGC's board, did not usually conduct labor negotiations. IGC's purpose in having Peters, rather than its usual labor negotiator, Alfred Pickett ("Pickett"), present was to expedite negotiations by having the people who had the power to approve an agreement present. Mattingly told the union representatives that IGC did not have the luxury of normal labor negotiations and that IGC needed SER from Local 550R to get continued financing from Security Pacific.

12. At the July 14, 1989, meeting, IGC presented an SER proposal similar in terms to the SER addendum accepted by Local 917 ("the July 14 proposal"). Additionally, however, under the July 14 proposal, the parties would drop all pending actions against each other, including Local 550R's wage conversion grievance against IGC (a dispute over whether employee service should carry over from the old CBA), the NLRB action, and a suit by IGC against Local 550R. IGC's intent was to resolve all disputes between the parties in addition to implementing wage reductions. Mattingly testified, however, resolution of those disputes was never a condition to agreement on wage reductions. The Local 550R representatives responded that it wanted its auditors to review the proposal and IGC's books and records before responding.

13. Howard Foreman, a research analyst for UFCW, had already examined the books of the three Debtors earlier in 1989. Now Leslie Nulty ("Nulty"), Director of UFCW's Research Office, requested additional specific items of information. Joe Lubbehusen, IGC's Director of Budgets and Control, provided much of this information, but some breakdowns were not provided because they could not be readily compiled. Nulty examined the provided records on July 18, 1989, at IGC, and requested no further information. During the course of negotiations, the union requested no further information. Included in the provided information were "store reports" for each of the four stores, showing detailed breakdowns of the stores' income and expenses for the first five periods of 1989. These are the reports that

IGC uses to judge the performance and profitability of each store. Also included were pro formas for each of the Local 550R stores ("the store pro formas") showing the impact of the proposed labor cost reductions and other measures IGC was taking to increase profitability.

14. A second meeting between Local 550R and IGC was held at UFCW's offices in Chicago on July 19, 1989. Present were Mattingly, Peters, Jacobs, Karmel and some observers. Jacobs said he could not respond to IGC's proposal because he had not yet received Nulty's report, but Jacobs did bring up some issues by way of counterproposal, including resolution of the wage conversion grievance, a change in the 70%–30% ratio of part-time to full-time employees (which Local 550R contended was unfair because some part-time workers were actually working more hours than some full-time workers), and restoration of the wage reductions at Danville, Brazil and Terre Haute South. Jacobs testified that it was necessary for these issues to be resolved in order to be able to determine the base from which SER might be negotiated.

15. A third meeting was held on August 22, 1989, at the Holiday Inn in Terre Haute. Mattingly told Jacobs and Karmel that he had not reserved a conference room, but that they would confer in a conversation pit in the lobby. The meeting was then moved to a coffee shop. Mattingly thought the conversation pit would be more conducive to negotiation than a formal conference room, but the Local 550R representatives saw it as a sign that IGC was not come prepared for serious talks. Jacobs testified that he asked for a response to the counterproposals, but IGC's attitude on the July 14 proposal was take it or leave it. Mattingly, however, testified that IGC was ready to talk about any of the terms, as long as the parties eventually reached the needed 16.5% cost reduction. That meeting, like the earlier ones, failed to produce an agreement.

16. Jacobs testified that the union rejected the July 14 proposal because IGC had not dealt in good faith. Mattingly, however, testified that Jacobs stated at the August 22 meeting that IGC appeared to be doing so badly financially that wage reductions could not save it, so none would be given. Although Jacobs and Nulty would not testify that this was indeed the basis for the union's actions, the Court credits Mattingly's testimony. If IGC would go under even with wage concessions, Local 550R employees would be better off not agreeing to wage cuts and dispute settlements of the July 14 proposal. The Vincennes employees would continue to receive wages under the CBA, and the employees at Danville, Brazil and Terre Haute South might have an administrative claim for back wages if they prevailed in the NLRB action. It appears that IGC had been all too successful in demonstrating its financial distress.

17. Davis testified at length about IGC's financial condition. IGC's profit margins suffered during a recent price war with competitors, but the effects of that price war appear to be abating. In order for IGC to survive, each of its stores must contribute to overhead and have a positive cash flow. Wage cuts at the four Local 550R stores are necessary for them to operate profitably. While IGC could conceivably close those stores and still reorganize, it would be more difficult because there would be fewer stores contributing to IGC's overhead expenses and IGC would have a smaller buying base.

18. Pickett and Davis testified to cost-cutting efforts by IGC, including reducing maintenance staff, cutting back on advertising, reducing hours in some stores, reducing the number of deliveries from Allied, selling or canceling leases on some cars, better loss prevention and renegotiating bascart, salvage and other contracts. Administrative staff expenses have been reduced by such actions eliminating two district managers, paying IGC's new president less than his predecessor, not replacing Voris when he left the company, and giving staff members more duties without increase in pay.

19. The salaries of Davis and Peters, and it appears the salaries of other top management of the Debtors who had not

left or changed positions (which range from approximately $46,000 to $156,500, according to the Debtors' schedules), have not been reduced. Six officers of Allied, in fact, received bonuses in January, 1989, with Davis receiving $13,500 and Peters $22,500. Davis testified that the bonuses were part of a program promised to Allied executives and were necessary to retain them. The bonuses were given because Allied's performance goals had been met in 1988, except for the impact of strikes that were outside the control of Allied's management. Allied also retains a suite at the Hoosier Dome, which Davis testified was necessary for entertaining Allied's customers. Wages at the non-union stores of Preston–Safeway have not been reduced, but although Preston–Safeway did not show a profit in 1988, its stores are now operating profitably and labor costs are below those of IGC. Employees of Allied represented by the Teamsters received a pay increase in their CBA of fall 1988, and Allied has not reduced their wages or moved to reject that CBA. However, according to Pickett, about three months ago Allied made a proposal for concessions, which those employees rejected, and is currently soliciting support for another proposal.

20. Davis testified that the shareholders of the Debtors had invested substantial personal assets in the Debtors to try to ensure their survival. They converted about $30 million they had loaned to one of the Debtors into a contribution to capital, and interest on other loans has been accrued but not paid, except interest on a loan they took out personally for IGC's benefit from a bank that would not lend to IGC, which interest is paid by IGC directly to the bank.

21. In all IGC stores in which SER has been implemented, employees' wages were reduced by up to 20%, but no wages were reduced below $4.00 per hour and wages below $4.00 per hour were not reduced. According to the store pro formas, the average Local 550R employee wage would be around $6.50 per hour under the SER rates.

22. Nulty testified that IGC's problems were not attributable to high labor costs, but rather to chronically low sales levels. Its labor costs, in fact, were below industry standards. According to Nulty's figures, reducing all Local 550R's wages to $4.00 per hour, or even $3.35 per hour, would not make a substantial difference. Nulty believes that IGC erred in engaging in a price war with its larger competitors and might have been wiser to concentrate on "niche marketing" to cater to a unique customer base. The assumptions of the store pro formas, such as increasing gross margins and sales per employee hour and lowering the stores' labor cost ratios, were out of line with industry figures and IGC's history. Nulty saw no realistic possibility that IGC could attain the CTO necessary to trigger the snap-back provision of the July 14 proposal. Nulty, however, admitted that she had not considered any unique features about IGC's operations that might make IGC's figures more realistic and its future more promising.

23. The SER rates IGC says it needs are in place at all stores but the one in Vincennes, Local 917 employees having agreed to the SER addendum to their CBA and IGC having implemented SER cuts in three of the four Local 550R stores after disputed votes. The primary reason IGC seeks to reject the CBA with Local 550R is to stop the clock on the potential liability on the NLRB action. If the CBA is rejected, and thus terminated, any claim the employees have for the pay differential between the CBA rates and the SER rates would cease accruing as of the date of termination and there would be a cap on potential liability on the NLRB action. IGC says that it must stop the clock on this potential liability to convince Security Pacific to continue its financing. If the CBA is rejected, the union's evidence suggests that the employees may strike, since the no strike clause of the CBA would also be rejected.

24. Additional findings of fact are made in discussion of applicable law below.

*Conclusions of Law*

This Court has jurisdiction over this matter. 28 U.S.C. section 157(b)(2)(A); *In re Texas Sheet Metals, Inc.*, 90 B.R. 260, 263 (Bankr.S.D.Tex.1988).

 An attempt by a debtor in possession ("DIP") to reject a CBA is governed by 11 U.S.C. section 1113. The parties agree, and the Court concurs, that in order to reject a collective bargaining agreement under that provision, a DIP must satisfy nine requirements, *see In re Big Sky Transportation Co.*, 104 B.R. 333, 335 (Bankr.D.Mont.1989), *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn. 1984), which will be set forth as part of the discussion of each below. Though a union may have the burden of production on some of the requirements, the DIP has the burden of persuasion by a preponderance of the evidence on all nine requirements. *See id.*

*Requirement 1: The DIP must have made a proposal to the union to modify the CBA.* Local 550R contends that IGC has not made a legitimate proposal for modification, but has, at least with respect to Danville, Brazil and Terre Haute South, presented a "done deal". The Court, however, concludes that IGC has indeed proposed a contract modification, certainly with respect to Vincennes, and also with respect to the other three stores. In Local 550R's view, the CBA, as agreed in December 1988, still stands with respect to all four stores. Local 550R is seeking back pay for employees of Danville, Brazil and Terre Haute South based on the CBA rates. It is the union's position that back pay liability continues to accrue as the difference between the CBA rates and the SER rates. Regardless of what IGC has done with wages rates, Local 550R maintains that the CBA as written still stands and is binding on IGC. IGC proposed to modify the CBA, as currently applied in Vincennes and as Local 550R contends it should still apply at the other stores, by changing the CBA rates to the SER rates. If such a proposal had been accepted, the employees at all four stores would have received the SER rates, and could not claim

contractual entitlement to any more from the point of the modification. IGC has, therefore, shown that it proposed a legitimate contract modification.

*Requirement 2: The proposal must have been based on the most complete and reliable information available.* Although Local 550R suggests that some of the information on which the proposal was based was unreliable, the Court concludes that IGC has shown that it used the most complete and reliable information and the best analysis it had available in formulating its proposal.

 *Requirement 3: The proposal must "provide[ ] for those necessary modifications in the employees [sic] benefits and protections that are necessary to permit reorganization of the debtor...."* 11 U.S.C. section 1113(b)(1)(A). Here there is a split in authority on what is meant by "necessary" modifications "necessary" to permit reorganization. Two circuit courts of appeals have entered the debate, analyzing section 1113, its legislative history, the Supreme Court case that precipitated the enactment of section 1113, i.e. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), and case law involving rejection of CBAs both before and since the enactment of section 1113. The Third Circuit concluded that "necessary" must be strictly construed and that the proposed modifications must be the minimum cutbacks that would allow the DIP to avoid liquidation in the short term. *See Wheeling–Pittsburgh Steel Corp. v. United Steelworkers*, 791 F.2d 1074, 1088 (3rd Cir.1986). The Second Circuit disagreed, concluding that the DIP satisfies this requirement when its proposal contains necessary, though not absolutely minimal, changes that will enable it to successfully complete reorganization. *See Truck Drivers Local 807, International Brotherhood of Teamsters, v. Carey Transportation Inc.*, 816 F.2d 82, 90 (2nd Cir.1987). *See also*, Rait, *Rejection of Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code: The Second Circuit Enters the Arena*, 63 Am.Bankr.L.J. 355 (Fall, 1989). This Court concludes that

*Carey's* less stringent interpretation, coupled with the other requirements of section 1113, comports best with the balance Congress was attempting to strike between labor's interests in CBAs embodied in the National Labor Relations Act and a debtor's interest in successful reorganization embodied in the Bankruptcy Code.

■ The issue, therefore, is whether the modifications of IGC's July 14 proposal, even if not the bare minimum to avoid immediate liquidation, were necessary to enable IGC to successfully complete reorganization. One of IGC's principal arguments for the necessity of the proposed modifications is that Security Pacific will not continue financing IGC and its affiliates if the modifications are not made, and without Security Pacific's continued financing, reorganization will fail and IGC will be forced to liquidate. Even though the SER rates are in place at three of the four Local 550R stores, Security Pacific is uneasy because potential back pay liability under the NLRB action continues to accrues as a potential administrative expense. Security Pacific would be more willing to continue its financing if a cap were put on this potential liability by rejection of the CBA. Yet, despite the fact that Security Pacific has been very active in the Debtors' bankruptcies and was apparently the driving force behind the original 16.5% labor cost reduction ultimatum, no one from Security Pacific was called to offer evidence about its position on continued financing or on the 16.5% requirement. The Court finds that IGC has not met its burden of showing that its July 14 proposal was necessary to retain financing from Security Pacific.

■ But regardless of IGC's financing arrangements with Security Pacific, IGC could satisfy this requirement if its evidence shows that its proposed modifications are necessary to enable it to successfully complete reorganization. As Local 550R found out last July, IGC faces serious financial problems. Although Nulty concluded that IGC's problems were not caused by high labor costs, but by low sales, labor costs must sometimes be reduced for successful reorganization even if they are not to blame for the debtor's plight. *See Big Sky Transportation,* 104 B.R. at 338. IGC's probability of successful reorganization will be enhanced if it both increases sales and reduces expenses, including labor costs, at each store and company wide. Without the SER concessions, the four Local 550R stores cannot operate profitably. IGC cannot afford to keep stores open that are not individually profitable, yet each store closing increases the overhead burden the remaining stores must carry, decreases IGC's buying base, and decreases IGC's chance for successful reorganization. With the proposed concessions in place at all but the Vincennes store, and leaving aside the increasing back pay claim Local 550R is asserting with respect to the other three stores, IGC is still operating at a loss, but appears to be inching its way toward profitability. In other words, the SER concessions appear to be enhancing IGC's chances for successful reorganization.

In spite of IGC's affiliate's retention of its Hoosier Dome suite (the cost of which is not in evidence), the Court concludes that IGC has made substantial efforts to reduce expenses. As Nulty recognized, increasing sales depends in part on offering the public attractive, well-stocked stores. IGC appears to have reduced its store expenses as much as it believes is possible without unduly compromising the operation of its stores. The absence of compensation reductions for top management and concessions from creditors, though relevant to requirement 3, will be discussed below under requirement 4.

■ The July 14 proposal contains a snap-back provision, so that if the Local 550R stores' average CTO rises above 2%, IGC and labor will share further profits equally in an effort to restore the concessions. Snap-back provisions in modification proposals are favored because they ensure that once a company is profitable enough for successful reorganization, further profits not "necessary" for reorganization are returned to the employees who made the concessions. *See Wheeling–Pittsburgh Steel,* 791 F.2d at 1093. Local 550R argues

that the snap-back provision in the July 14 proposal is meaningless because the stores cannot be expected to achieve the necessary 2% CTO floor. It does not challenge the 50–50 sharing, nor does it suggest that the 2% floor is unreasonably high, if attainable. The Court therefore concludes that the snap-back provision serves its purpose of allowing employees to share the benefits of future financial prosperity, even if that level of prosperity is not very likely.

■ Local 550R contends that the July 14 proposal was not limited to cost-saving proposals, but improperly contained non-economic proposals, which by their nature were not necessary for reorganization. It points to proposals that Local 550R drop its wage conversion grievance and the NLRB action, that IGC drop its civil suit against Local 550R, and that both drop various unfair labor practice actions and other complaints against each other. While the Court does not have evidence on the subject matter of all these actions, those that it does have evidence on all involve economic issues. The wage conversion and the NLRB action, in particular, involve claims for monetary recovery or declarations that would have monetary impact on IGC. Those proposals are not of the same nature as those faulted in other cases as having no impact on labor costs, such as proposals to change grievance proceedings, union security and apprentice ratios, *see In re William P. Brogna and Company*, 64 B.R. 390, 392 (Bankr.E.D.Pa.1986), or changes to make it easier for an employer to require overtime and to move employees around a plant, *see In re Valley Kitchens, Inc.*, 52 B.R. 493, 495 (Bankr.S.D. Ohio 1985). Moreover, IGC did not make resolution of pending actions a condition for agreement on prospective wage reductions, but included them in an effort to "bury the hatchet" and stop all fighting between the parties. The Court therefore finds no fault with IGC's inclusion of those items in its proposal.

The Court finds that IGC has met its burden of showing that the proposed modifications are a necessary part of IGC's cost savings effort, which is necessary to enable it to complete reorganization successfully.

*Requirement 4: The proposed modifications must assure that creditors, the DIP and all affected parties are treated fairly and equitably.* Local 550R contends that the proposal was not fair and equitable in that no concessions were required of Preston–Safeway's non-union employees or of Allied's employees represented by the Teamsters, top management of IGC and the related Debtors have not taken a pay cut, and in fact, some received bonuses in January 1989, and IGC failed to quantify the sacrifices it says its creditors are making to facilitate reorganization.

■ IGC contends, at least implicitly, that Preston–Safeway and Allied are separate entities and compensation paid to employees and officers of those entities is not relevant. Although the Debtors are separate legal entities, they have common ownership, share much of their top management, and do much business with one another. During 1988, Allied's principal financier considered Allied's fate so closely tied to IGC's performance that it insisted on reductions in *IGC's* labor costs as a condition for continued financing of *Allied.* All three Debtors filed for bankruptcy relief on the same date. All three Debtors contribute, directly or indirectly, to Preston–Safeway Management, Inc., which pays the salaries of top management of the Debtors. IGC's contribution shows up as an administrative expense on its books. This shows a close enough relationship among the Debtors to make compensation received by employees and management of Preston–Safeway and Allied relevant, considered in context of the unique financial conditions of those entities.

■ A debtor is not required in all cases to show that managers, non-union employees and employees represented by other unions will have their benefits cut by the same degree that the benefits of workers covered by the CBA sought to be rejected are cut. *See Carey*, 816 F.2d at 90; *Texas Sheet Metals*, 90 B.R. at 269. While such a showing might demonstrate that all workers are shouldering a proportionate share of the burden, other factors could also demonstrate a fair distribution of bur-

den, such as if some workers assumed greater responsibility and worked longer hours for no increase in pay, or if some workers' compensation is barely competitive while wages under the CBA sought to be rejected are above industry standards. *See Carey*, 816 F.2d at 90–91, 93. Equity under section 1113 means fairness under the circumstances, not a dollar for dollar comparison. *See In re Walway Company*, 69 B.R. 967, 974 (Bankr.E.D.Mich.1987).

■■■ Davis testified that the stores of Preston–Safeway are profitable and that its labor costs are lower than those of IGC. It's a fair inference that Preston–Safeway non-union employees are already making at or below the SER rates proposed by IGC. Under those circumstances, the Court concludes that it is not unfair to refrain from asking for reductions from those workers. No evidence was presented on the wages the Teamsters at Allied are making. Even if the wages are above the SER rates, as is likely, a comparison in absolute terms may not be meaningful since the work is quite different from that of the Local 550R members. According to IGC's evidence, Allied has sought and is presently seeking concessions from the Teamsters. IGC already sought and obtained concessions from members of Local 917. Local 550R contends that comparing the need for identical concessions between Local 917 and Local 550R is like comparing "apples to oranges" because Local 917 has three times more stores and four times more bargaining unit employees. The implicit argument is that even though employees of the two locals do almost identical work, concessions from the smaller local may not be asked if concessions from the larger local are sufficient to allow reorganization. However, it is not fair or equitable to allow a small bargaining unit to unfairly benefit from the sacrifices of fellow employees even if such refusal has no effect on the debtor's ability to reorganize. *See* 5 Collier on Bankruptcy, para. 1113.01[4][h] (15th ed.). The Court concludes that IGC has presented sufficient evidence that the Local 550R members are not being unfairly singled out

among lower level employees for wage concessions.

■■■ More troubling, however, is the absence of compensation reductions for top management. Davis testified that his salary had not been reduced, and he knew of no other top manager's salary that had been. He testified that bonuses were given to officers of Allied, including himself, based on Allied's performance in 1988, which was considered separately from IGC's performance. Perhaps in the bonus formula the performances of Allied and IGC were separate, but in terms of economic reality, they were inseparable, as the common officers of Allied and IGC knew well in 1988, when Security Pacific was insisting on labor cost reductions in IGC. No evidence was presented comparing the Debtors' top management compensation with that of comparable businesses. The Court credits Nulty's testimony that Local 550R benefits are already below industry standards. Testimony about management's assumption of additional duties was not supported by details. Although Davis testified in a conclusory manner that the bonuses were necessary to retain top management, IGC presented no evidence that withholding the bonuses or reducing top management compensation was ever broached, let alone rejected under threat of mass exodus. The absence of compensation reductions for top management suggests they may share the attitude IGC condemns in the union—take what you can as long as you can get it. IGC has not borne its burden of proof that it is fair and equitable to ask for wage cuts of up to 20% from Local 550R members, many of whom make less per year than Davis's 1988 bonus, while top management takes no reduction.

■■■ Little evidence was adduced on the role IGC's creditors are playing in reorganization efforts. The interests of unsecured creditors, secured creditors, priority creditors and creditors with claims resulting from rejection of an executory contract (such as Local 550R members would have) have different rights under a reorganization, *see e.g.* 11 U.S.C. section 1129(a)(7), (b)(2), and creditors and employees play different roles in reorganization. Fair and equitable treatment of creditors and em-

ployees does not mean identical and equal treatment. *See Big Sky Transportation,* 104 B.R. at 337. A secured creditor, for instance, might bear its burden of assisting reorganization by risking depreciation of its collateral and advancing the debtor more credit, rather than making concessions in the amount of its claim. Again, equity means fairness under the circumstances. *See Walway Company,* 69 B.R. at 974.

There was testimony that one bank was foregoing current payments on a $1.8 million loan, though it would not forego accrual of interest. There was no evidence on what concessions Security Pacific might be making or what risks it might be taking to facilitate reorganization. It would probably be an unreasonable burden for a debtor to have to get and prove burden sharing by every one of its creditors, but a debtor should show that major creditors who stand to benefit greatly from successful reorganization and from concessions employees make, such as Security Pacific, with its blanket security interest in IGC's assets, are bearing in some manner their fair share of the burden of reorganization. The Court concludes that IGC presented insufficient evidence on this issue.

With the serious financial problems IGC faces, the Court finds that wage reductions from Local 550R employees would be necessary even with reductions in top management compensation and creditor concessions. Yet, though necessary, those wage reductions must also be fair and equitable. IGC has failed to prove that top management and creditors are bearing an equitable burden in IGC's reorganization, and thus, that all affected parties are treated fairly and equitably.

*Requirement 5: The DIP must have provided the Union with such relevant information as is necessary to evaluate the proposal.* IGC made its best effort to provide the information requested by Nulty and other representatives of Local 550R. IGC gave Local 550R several opportunities to request further information during negotiations over the July 14 proposal, but Local 550R neither requested more information nor complained that its information was insufficient before deciding to reject the July 14 proposal. IGC has borne its burden of proof on this item.

*Requirement 6: The DIP must have met at reasonable times with the union.* IGC has borne its burden of proving that it met at reasonable times with Local 550R representative to discuss the proposed modifications.

*Requirement 7: At the meetings, the DIP must confer in good faith in attempting to reach mutually satisfactory modifications to the CBA.* There is some indication that IGC was not completely forthcoming with the UFCW locals in fall of 1988, when it failed to disclose Security Pacific's demand for a 16.5% labor cost reduction, and then in December, 1988, agreed to a CBA that did not provide for the needed reductions. IGC appears to have agreed to wage rates it had every intention of immediately reducing, at least in the 12 listed stores, through SER requests based on its interpretation of "acceptable sales levels". But the focus here is on the negotiations at the meetings at which the July 14 proposal was discussed, and the Court does not find that the nondisclosures of fall 1988 were so egregious as to taint the meetings at issue.

It is obvious that there were hostilities and misunderstandings at those meetings. Local 550R appears to have taken offense at IGC's departure of usual collective bargaining procedures, at IGC's attempt to hold the final meeting in a hotel lobby rather than in a private conference room, and perhaps at being taken for granted earlier while IGC focused its attention on getting concessions from Local 917. IGC may have made some bad judgment calls, but the court credits Mattingly's testimony that IGC did not present the July 14 proposal on a take it or leave it basis, but expressed willingness to negotiate on any point as long as result was the overall 16.5% labor cost reduction required by Security Pacific. Since Local 550R did not make lack of top management compensa-

tion reduction or lack of creditor concessions points of negotiation, the Court will not find that IGC would have refused legitimate demands in these areas. The Court concludes that IGC has shown that it came to the meetings prepared to negotiate the proposed modifications in good faith.

■ *Requirement 8: The union must have refused to accept the proposal without good cause.* The Court has found that Local 550R rejected the July 14 proposal because it had concluded that IGC could not survive even with the reductions, and its members would be better off retaining their claims to the CBA rates, which they could arguably assert as an administrative claim if they prevailed in the NLRB action (or in the case of the Vincennes employees, which they would receive until IGC's demise). Though this stance might indeed benefit Local 550R employees more than wage concessions if IGC is indeed doomed to fail, this purely selfish concern cannot be good cause for refusing to cooperate with a debtor's good faith efforts to reorganize. *Cf. In re Salt Creek Freightways*, 47 B.R. 835, 840–41 (Bankr.D.Wyo.1985) (union's policy not to negotiate away from national master agreement understandable, but not good cause for rejecting proposal).

■ Although there might have been good cause for Local 550R to refuse the July 14 modification, i.e. lack of compensation reductions for top management and of creditor concessions, the Court finds that these were not in fact the reasons for rejection because Local 550R did not bring those subjects up during negotiations. The Court cannot speculate whether Local 550R would have rejected the modification for these legitimate reasons in the absence of the improper reason, or whether IGC would have corrected the problems if Local 550R had brought them up.

■ *Requirement 9: The balance of the equities must clearly favor rejection of the CBA.* The parties agree, and the Court concurs, that this requirement of section 1113 codifies the equitable test set forth in *Bildisco*, in which the Supreme Court directed that a bankruptcy court balance the interests of the debtor, creditors

and employees, considering the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of creditors' claims if the CBA were affirmed, the impact on rejection on the employees, and the degree and quality of the hardship each may face. *See Bildisco*, 104 S.Ct. at 1197.

■ The Court has found that rejection of the CBA so that IGC can implement uncontested SER in all Local 550R stores would enhance its chance for successful reorganization. If the CBA is not rejected, it is likely that the Local 550R stores will be closed, even if IGC is not forced into liquidation, putting those employees out of work. Rejection of the CBA would result in lower wages for employees whose wages are already modest, but if the CBA is not rejected, those employees may soon lose their jobs. Creditors, employees and IGC will clearly be better off if IGC reorganizes as a going concern rather than liquidates. Rejection of the CBA would entitle the Local 550R employees to file a claim for breach of contract, presumably for the difference between what they would have received under the CBA and what IGC will actually pay after rejection, which would be treated as a prepetition claim. *See* 11 U.S.C. section 365(g)(1). Assuming this would be a general unsecured claim, it would have a less detrimental effect on IGC's ability to formulate a plan of reorganization and on other creditors' distribution than would the claim in like amount that could result from the NLRB action, which Local 550R could arguably assert as an administrative claim with priority over general unsecured claims. *See* 11 U.S.C. sections 1129(a)(7)(A), 726(a)(1), 507(a)(1) and 503(b)(1)(A).

Although these concerns militate in favor of allowing rejection of the CBA, the Court cannot find that the equities *clearly* favor rejection if IGC has failed to show that its top management and its creditors are shouldering a fair share of the burden of reorganization. IGC therefore has failed to establish this final requirement.

■ *Conclusion.* Although IGC has failed at this point to prove its entitlement to reject the CBA, the Court does not believe this should permanently preclude rejection. IGC presented a strong case that its reorganization efforts will have a better chance of success if it is allowed to make the proposed reductions in labor costs. The facts and defects in proof that led this Court to conclude that IGC has not proven every requirement for relief may be susceptible to correction. The Court will therefore grant IGC leave to renew its motion after 60 days. If at that time, after engaging in renewed, good faith negotiations with Local 550R, IGC renews its motion, the Court will consider further evidence the parties wish to present on this issue.

Judgment on this order will be entered separately.